29. The location of the observation post was chosen because the SNEU team believed that there was a high level of drug sale activity at the location.

30. Defendant Police Officer Joseph Barosa was situated on the roof of a building located at West 47th Street and Eighth Avenue. Officer Barosa was situated on a rooftop of a five-story building, on the north side of the street and facing south towards 310 West 47th Street.

31. Defendants Police Officers Hawthorne, Thornton, MacDonnell, and Sergeant McCord were assigned to apprehend individuals, who were observed by Officer Barosa buying or selling narcotics.

32. At approximately 1:00 a.m. on February 16, 2001, it was extremely cold and dark outside.

33. At approximately 1:00 a.m. on February 16, 2001, the individually named defendant Police Officers had been working outside for several hours and the SNEU team had not made any arrests that night.

34. The defendant SNEU team officers knew that they would have to justify the amount of "activity" and arrests they made during their tour of duty to their supervisors, and they knew that they were expected to make several arrests during their tour of duty because the location they were "observing" had a high incidence of drug sales.

35. Additionally, the individually named defendant officers knew that they would be able to go inside and warm themselves after they made arrests that night.

36. Therefore, the individually named defendant police officers decided to target, stop, and search individuals who fit their stereotype of somebody who appeared to be a drug addict and who would likely be carrying illegal narcotics on their person.

37. The individually named police officer defendants knew that if they recovered narcotics from an individual then they could easily justify the stop and search of the individual by creating a false version of events about why the individual was initially stopped and searched.

38. The individually named police officer defendants believed that a prosecutor, a Court, and a jury would likely credit their version of events over the denials from a drug addict.

39. The individually named police officers believed that if they created a false version of events about why plaintiff was initially stopped and searched then plaintiff would likely plead guilty to the crimes for which he was charged.

40. On February 16, 2001, each of the individually named defendant police officers had made hundreds of narcotics arrests in their careers at the NYPD, but they each had only testified in criminal trials related to those arrests fewer than five times because most of the individuals they arrested pled guilty to the crimes for which they were charged.

41. On February 16, 2001, the individually named defendant police officers targeted plaintiff and another individual as people whom the officers would stop and search.

42. The officers targeted plaintiff and the other individual to be stopped and searched because both plaintiff and the other individual appeared disheveled and fit the defendant police officers profile of likely drug addicts.

43. In the early morning hours of February 16, 2001, plaintiff Vincent Carr was unlawfully stopped and searched and thereafter falsely arrested at the corner of 47th Street and Eighth Avenue in the County and State of New York.

44. On February 15, 2001 and February 16, 2001 plaintiff Vincent Carr was admittedly a drug user.

45. On February 15, 2001, plaintiff ran into a female companion who was also a drug user and at her request, plaintiff purchased drugs for her.

46. Plaintiff purchased drugs for his female companion approximately an hour and a half to two hours before he was approached by and arrested by the defendant Police Officers.

47. Plaintiff's female companion told him to wait for her on the corner of 47th Street and Eighth Avenue while she spent time with her friend inside of a nearby hotel.

48. Plaintiff waited for his female companion on the corner of 47th Street and Eighth Avenue as instructed.

49. The defendant Police Officers did not observe plaintiff purchase narcotics for plaintiff's female companion.

50. The defendant Police Officers did not observe plaintiff buy or sell narcotics to anybody.

51. Nevertheless, approximately two hours after plaintiff purchased the drugs, plaintiff was targeted by, and approached by, the defendant police officers without reasonable suspicion or probable cause and was physically thrown against the wall of a building.

52. Without probable cause or reasonable suspicion, the defendant police officers unconstitutionally searched plaintiff.

53. The defendant police officers recovered narcotics from plaintiff's pocket.

54. At approximately 1:00 a.m. on February 16, 2001, plaintiff and another individual, whom plaintiff had never seen or met before were arrested by the individually named

defendant police officers even though the officers knew that the narcotics recovered from both individuals were discovered as a result of unconstitutional stops and searches.

55. Plaintiff was transported to a New York City Police Department precinct station house by the defendant police officers, and arrived inside the warmth of the stationhouse at approximately 1:15 p.m. on February 16, 2001. .

56. At the precinct station house, plaintiff was falsely accused by the individually named defendant police officers of selling narcotics to the other individual arrested by the officers, whom plaintiff had never seen or met before.

57. The other individual arrested by the defendant police officers appeared to be a homeless drug addict.

58. Plaintiff denied selling narcotics to the man and told the defendant police officers that he was waiting on the street corner to meet a female companion whom he intended to spend time with at a hotel.

59. The individually named defendant Police Officers knew that the narcotics recovered from plaintiff would be suppressed as evidence in any criminal prosecution against plaintiff unless the officers provided the prosecutor with a basis for stopping and searching plaintiff.

60. In order to prevent the drugs recovered from plaintiff from being suppressed as evidence, the individually named defendant police officers concocted a fabricated version of events about why they stopped and searched plaintiff, which was told to the prosecutor.

61. During the course of the criminal prosecution against plaintiff, the individually named police officer defendants were required to testify under oath several times.

Each time they testified, the individually named defendant police officers perjured themselves when they testified about the events that led to the stop and search of plaintiff.

62. The individually named police officers lied about their observations of plaintiff prior to stopping and searching plaintiff, and the events leading to plaintiff's arrest.

63. As a result of the fabricated version of events that was communicated to the New York County Office of the District Attorney by the individually named police officer defendants, plaintiff was wrongfully and falsely charged with serious crimes that he did not commit.

64. Throughout the prosecution, the individually named police officer defendants repeatedly perjured themselves when they testified before the Grand Jury, at evidentiary hearings, and at trial.

65. The individually named defendants perjured themselves when they testified about observations allegedly made of plaintiff from the observation post on the roof, prior to the time he was stopped and searched. In fact, from the defendant police officer's on the roof of the building, he would be unable to see the activity he alleged to have observed.

66. Throughout the course of the criminal prosecution the individually named police officers alleged their versions of events in order to make each of their versions of events consistent with each other and consistent with the physical evidence.

67. The individually named police officer defendants even changed their version of events regarding where plaintiff was observed and arrested.

68. Additionally, defendant Police Officer Barosa lied to the Grand jury and the prosecutor about the color of the ziplock bags recovered from plaintiff.

69. Defendant Police Officer Barosa lied to the Grand Jury and the prosecutor about the color of the ziplock bags recovered from plaintiff because he wanted the color of the ziplock bags recovered from plaintiff to match the color of the ziplock bags allegedly recovered from the individual plaintiff was accused observed selling drugs.

70. Defendant Police Officer Barosa was so intent about having plaintiff indicted by a Grand Jury and thereafter convicted, that he even perjured himself at the Grand Jury when he testified that the binoculars he allegedly used on the date of plaintiff's arrest were issued to him as equipment by the New York City Police Department, when, in fact, the binoculars in question were actually bought by defendant Barosa at the Sports Authority store and were not NYPD equipment.

71. The individually named defendant police officers and sergeants provided false information to the Assistant District Attorney and the Grand Jury to explain why they stopped and searched plaintiff.

72. The officers created false versions of events to justify the search of plaintiff so that the narcotics found would not be suppressed during the criminal prosecution of plaintiff.

73. On February 21, 2011, defendant Police Officers Barosa and Hawthorne falsely testified before the Grand Jury.

74. Plaintiff Vincent Carr was indicted by a grand jury based upon the fabricated testimony of the individually named defendant police officers and sergeants.

75. The presumption of probable cause created by the Grand Jury indictment is rebuttable in this case because the indictment was based upon false statements told to the grand jury by the individually named police officer defendants and sergeants.

76.  Plaintiff was charged with Criminal Sale of a Controlled Substance in or Near School Grounds, Criminal Sale of a Controlled Substance in the Third Degree, and Criminal Possession of a Controlled Substance in the Third Degree (possession with intent to sell).

77.  Plaintiff could not post bail at his arraignment and plaintiff remained incarcerated in New York City jails throughout the prosecution against him.

78.  On December 12, 2001, plaintiff was convicted of Criminal Possession of a Controlled Substance in the Third Degree (Possession with intent to sell) and acquitted of the charges for Criminal Sale of a Controlled Substance in or Near School Grounds and Criminal Sale of a Controlled Substance in the Fourth Degree, following a jury trial in New York State Supreme Court in the County of New York.

79.  Plaintiff was sentenced to an indeterminate term of four and one-half to nine years imprisonment.

80.  In or about August, 2005 plaintiff was released on parole, subject to the conditions of parole. Plaintiff's liberty interests continued to be restricted by the conditions placed on him by the New York State Department of Parole.

81.  Plaintiff filed a habeas corpus petition pursuant to 28 U.S.C. § 2254, claiming that he was being held in state custody in violation of his due process right to a fair trial.

82.  Plaintiff's habeas corpus petition was granted in the Southern District of New York by the Honorable Shira A. Scheindlin, finding that plaintiff's Constitutional Right to a fair trial was violated, and the decision granting plaintiff's habeas petition was affirmed by the Second Circuit on December 4, 2008.